Cheryl A. Cauley (SBN 252262)
cheryl.cauley@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. 1, Suite 200
Palo Alto, California 94304
Telephone: (650) 739-7500

Karan Singh Dhadialla (SBN 296313)
karan.dhadialla@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200

Sterling Andrew Marchand (SBN 361586)
sterling.marchand@bakerbotts.com
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Telephone: (202) 639-7700

*Counsel for Plaintiff Francine Shulman*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

| | |
|---|---|
| In Re<br><br>TODD STUART KAPLAN<br><br>Debtor. | Bankruptcy Case No. 9:25-bk-10686-RC<br><br>Chapter 7<br><br>Adversary No.: |
| FRANCINE SHULMAN,<br><br>Plaintiff,<br><br>v.<br><br>TODD STUART KAPLAN,<br><br>Defendant. | **ADVERSARY COMPLAINT FOR REVOCATION OF DISCHARGE PURSUANT TO 11 U.S.C. § 727** |

## INTRODUCTION

1. Plaintiff Francine Shulman ("Plaintiff") consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

2. This is an adversary proceeding by Plaintiff requesting revocation of Debtor Todd Stuart Kaplan's ("Defendant" or "Kaplan") discharge dated August 25, 2025, pursuant to 11 U.S.C. § 727(d)(1).

## PARTIES & VENUE

3. Plaintiff is an individual and, at all relevant times, a resident of the State of California.

4. Plaintiff is a secured creditor of the Debtor as set forth in paragraphs 9–13 below.

5. Defendant Todd Stuart Kaplan is the Chapter 7 debtor in the above-captioned case.

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

7. Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under Chapter 7 that is pending in this district (Case No. 9:25-bk-10686-RC).

8. This adversary proceeding is commenced pursuant to 11 U.S.C. § 727(d)(1).

## FACTUAL ALLEGATIONS

### Plaintiff's Judgment Against Kaplan

9. On December 9, 2024, following a two-week jury trial, the Superior Court for the County of Los Angeles entered a $28,104,929 judgment against Kaplan in favor of Plaintiff on claims of fraud – intentional misrepresentation, fraud – concealment, breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contractual relations, intentional interference with prospective economic advantage, and financial elder abuse.

10. The Superior Court for the County of Los Angeles also entered a $34,487,736 judgment against Kaplan's codefendant and company Medical Investor Holdings LLC ("MIH") in favor of Plaintiff on claims of fraud – intentional misrepresentation, fraud – concealment, breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with

contractual relations, intentional interference with prospective economic advantage, and financial elder abuse.

11. Kaplan is a businessman and admitted felon. Prior to the state court lawsuit filed by Plaintiff, a federal grand jury indicted him for health care fraud, conspiracy to commit money laundering, illegal kickbacks, and attempted tax evasion. He pleaded guilty in 2007 to the tax charge.

12. MIH, formed by Kaplan in 2016, is a California limited liability corporation that grows cannabis and sells it to distributors. MIH is sometimes referred to as "Vertical." MIH owned and later leased a property in Needles, California, where it grew cannabis and prepared it for distribution. MIH claims to have raised at least $65 million through investment funds and reported net revenues of up to $16.85 million per year, largely in cash sales.

13. Neither Kaplan nor MIH ever made any payments towards the state court judgment. Kaplan and MIH initially appealed the state court judgment on March 28, 2025, and then voluntarily dismissed the appeal on February 25, 2026.

**<u>Bankruptcy Proceedings</u>**

14. On May 22, 2025, Kaplan filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Nancy J. Zamora was appointed the Chapter 7 Case Trustee. In filings in the Los Angeles County Superior Court on August 25, 2025, and in subsequent filings, Kaplan argued that all proceedings against him, including enforcement and the contempt proceedings brought against him, must be stayed because of the ongoing bankruptcy proceedings.

15. On June 5, 2025, Kaplan filed his Schedules of Property. *See* Dkt. No. 9.

16. In his Schedule A/B: Property, Kaplan claimed a 20-25% share in MIH. Kaplan claimed this stock was worth $0.00. *Id.* at 7.

17. In his Schedule A/B: Property, Kaplan also declared that the value of the cannabis licenses in his name were "believed to be zero." *Id*.

18. In his Schedule I, Kaplan declared his income was only $3,750. *Id.* at 36.

19. In his Schedule E/F, Kaplan listed as personal debts numerous credit cards. *Id.* at 17–22, 26–28.

20. On June 16, 2025, Kaplan testified under oath at a § 341(a) Meeting of Creditors.

21. During the Meeting of Creditors, the U.S. Trustee and Chapter 7 Trustee both raised concerns that if Kaplan had an ongoing role in MIH, and there were cannabis assets to be adjudicated, the policy of the United States in treating cannabis as a controlled substance would not permit adjudication of the bankruptcy to proceed.

> **Nancy J. Zamora (Chapter 7 Trustee):** I think if I may say this for the record, Mr. Escobar, if it's found that this case relates to a cannabis business, that the U.S. Trustee may be seeking a dismissal of the case, and in part, that's a threshold issue for my administration of any assets or involvement in exercising any right with regard to the appeal, which is now an asset of the bankruptcy case, as well as the inheritance that you're entitled to in administering your interest in that trust (or whatever form that takes, I don't think it's a probate) the testamentary trust that currently exists. So I have a number of documents I also need, but it may be more appropriate to wait for the U.S. Trustee's office to make its determination about any further actions to be taken. […]
>
> **Zamora:** Well, when it comes to the questions about the cannabis business, et cetera, again, I defer to the U.S. Trustee's office. If this is determined to be a bankruptcy, then it directly involves a cannabis business, the U.S. Trustee's office will most likely be seeking a dismissal of the case, and I certainly cannot administer any assets that are related to such a business, whether it's by sale of stock or collection of monies loaned that are due the debtor, that's a hands off. […]
>
> **Zamora:** Okay, you know, I'm very concerned that there is so much relationship with the cannabis business. I have so many documents, Mr. Steinberg, to request from you, and so much more, in the form of questions for a continuing 341A which will be July 24, 2025, at 12:30 but at this point, I don't see a reason to belabor this, because I really think the overlap with the cannabis business is overwhelming. Mr. Escobar,

I know you can't necessarily make it a conclusion here on the record, but I know there's a process that has to be followed to make that determination. Is that correct?

**Eric Escobar (U.S. Trustee):** Correct.

22. During the June 16, 2025 Meeting of Creditors, Kaplan testified as to his continuing role and interest in MIH with at least the following statements under oath:

a. Kaplan testified that he was not employed because the receiver "terminated" him from his position as MIH's CEO;

b. Kaplan testified that he had not been involved with MIH since March 2025;

c. When asked about his knowledge of MIH's operations, Kaplan testified, "I haven't been involved in the company. I couldn't tell you how many plants they have;"

d. When asked if he held an officer position at MIH, Kaplan testified that he "was" previously a chairman of the board of MIH, but "[l]ike I said, I was terminated, and so . . . ."

e. Kaplan testified that MIH made payments on his car leases "probably eight or nine times" in the last twelve months.

23. When pressed by the U.S. Trustee during that Meeting of Creditors on his then position within and interest in MIH, Kaplan testified as follows:

**Eric Escobar (U.S. Trustee):** Notwithstanding your termination, are you still involved in the operations of MIH?

**Todd Kaplan:** I'm just a shareholder and I'm trying to wrap things up for people, but not really, no.

**Escobar:** Okay, when you say you're trying to wrap things up for people, what does that mean?

**Kaplan:** There's lots of people call me and ask me what's going on. So I'm trying to tell them I don't know if the company will continue or not.

**Escobar:** Are you facilitating in the transition of folks who are operating? In other words, providing them with whatever they need to continue operations?

**Kaplan:** No, sir.

24. When the U.S. Trustee asked Kaplan if MIH had a new CEO he testified: "Not presently, there's no money to pay anybody. So no."

25. Kaplan also testified regarding the status of the cannabis company he founded, controlled, and managed, MIH:

a. Kaplan testified that MIH had no value as an entity;

b. Kaplan claimed that he previously, "thought there's a chance the company could still survive," but that after a receiver was briefly appointed over the business and he filed for bankruptcy, he no longer "believe[d] there's any value to the company."

26. As discussed below, evidence subsequently discovered demonstrates that Kaplan knowingly and fraudulent concealed the truth or made affirmative misrepresentations in his sworn Schedule disclosures filed June 5, 2025, and in a number of sworn statements made during the June 16, 2025 Meeting of Creditors.

27. Specifically, and as detailed below, Kaplan intentionally concealed and misrepresented his ongoing role and interests in a cannabis company, MIH; concealed MIH's assets, and his control of those assets; and concealed and/or misrepresented the value of those assets.

28. Kaplan and MIH owed money in the form of a judgment to Plaintiff. MIH's assets were subsequently sold and disposed of without any accounting to Plaintiff and the proceeds are unaccounted for, despite orders issued by the Los Angeles County Superior Court ordering MIH to distribute the proceeds of sales to Plaintiff and provide Plaintiff with a weekly accounting.

29. On July 18, 2025, the Los Angeles County Superior Court issued a Temporary Restraining Order against MIH, which ordered it to provide Plaintiff a weekly inventory of assets and reasonable notice before the disbursement of any assets. On August 22, 2025, the Los Angeles County Superior Court issued an Order granting Plaintiff's *Ex Parte* Application for a Turnover Order against MIH that ordered MIH to immediately turnover to Plaintiff the proceeds of the cannabis that it had sold since July 18, 2025, and any that it would later sell. MIH never complied with either order, despite continuing to sell cannabis.On August 25, 2025, the Bankruptcy Court

entered an Order discharging all of Todd Kaplan's debts pursuant to 11 U.S.C. § 727. *See* Dkt. No. 20.

**<u>Subsequent Evidence of Kaplan's Concealment and Misrepresentations of His Ongoing Role and Interests in MIH, A Cannabis Company</u>**

30. After the date of discharge, Plaintiff learned MIH had ongoing operations, including from May through August of 2025, and that Todd Kaplan had concealed his direct and personal interest in MIH and his involvement in MIH's operations at the time of the June 16, 2025 Creditor's Meeting and in the following months.

31. That concealed involvement and interest included: (i) acting as CEO of MIH; (ii) serving as MIH's sole Member; (iii) chairing MIH's Board of Directors at multiple meetings, including meetings at which MIH's Board approved significant sales of MIH's cannabis and other assets; (iv) holding MIH's cannabis licenses in his name; (v) directing MIH's operations; and (vi) directing MIH's sales of cannabis, in part, through his brother Robert Scott Kaplan.

32. As discussed above, the cannabis sales were done in contravention of Orders issued by the Los Angeles County Superior Court.

33. Evidence of Kaplan's control over and involvement in MIH, including at the time of the Meeting of Creditors and contrary to his sworn statements, include as follows:

34. It is undisputed that as of March 13, 2025, Kaplan was MIH's CEO. In an August 25, 2025 declaration to the Los Angeles County Superior Court, which he served on Plaintiff from his MIH email account, Kaplan purports to have been terminated as CEO of MIH by the court-appointed receiver on or around March 13, 2025.

35. The Superior Court for the County of Los Angeles appointed a receiver to manage MIH on March 11, 2025. The receivership was terminated by the Superior Court for the County of Los Angeles on April 1, 2025.

36. There is no documentation of Kaplan's removal as CEO. It is undisputed that no CEO was ever appointed as Kaplan's replacement.

37. In fact, Kaplan continued to act in a capacity whereby he was the chief executive of MIH.

38. Plaintiff discovered on August 25, 2025 that Kaplan still maintained an MIH email account. On information and belief, Kaplan maintained the MIH email account through at least September 12, 2025.

39. Text messages produced by Robert Scott Kaplan on March 19, 2026 show that MIH included Todd Kaplan in their payroll system and issued payroll checks to Todd Kaplan through at least June 2025. Robert Scott Kaplan is Todd Kaplan's brother, the Chief Technology Officer at MIH, and the individual who was responsible for keeping minutes at MIH board meetings.

40. It is undisputed that as of March 11, 2025, Kaplan was MIH's sole Manager.

41. MIH's operating agreement states that "[u]pon the death, resignation or removal of the Manager, a replacement shall be appointed by the Board."

42. There is no documentation of Kaplan's removal or resignation as MIH's Manager. No Manager was ever appointed as Kaplan's replacement by the MIH board of directors.

43. The California Secretary of State website continues to list Kaplan as the sole "Manager" or "Member" of MIH.

44. It is undisputed that as of June 20, 2025, Kaplan was the Chairman of MIH's board of directors.

45. In an August 25, 2025 declaration to the Los Angeles County Superior Court, Kaplan purports to have resigned as Chairman of MIH's Board of Directors as of June 20, 2025. There is no documentation of Kaplan's removal as the Chairman of MIH's board of directors.

46. As discussed below, contemporaneous text messages from June and July 2025, and sworn deposition testimony from others at MIH, confirm that Kaplan continued to act as the Chairman of MIH's Board of Directors.

47. On November 20, 2025, Chris Kai (who Kaplan described as MIH's Chief Operating Officer) produced text messages to Plaintiff. That production included a number of text messages from Mr. Kai to Kaplan, who Mr. Kai had saved in his phone as "Todd Kaplan Vertical CEO." "Vertical" is a pseudonym commonly used by MIH for the company.

48. On July 1, 2025, Mr. Kai sent via text to Todd Kaplan a list of “Board Questions” he needed Kaplan to raise in a meeting with MIH’s board of directors the following day. In a text accompanying his questions, Mr. Kai wrote these “are some of the questions I would need clarification on from the board tomorrow morning.”

49. Those questions are as follows:


2:45
370
T
Todd Kaplan Vertical Ceo
Tue, Jul 1 at 7:28PM
Please send me the text, thanks
Board Questions
- Shulman Group has not responded back by the 5pm deadline on tuesday July 1st 2025. What are we doing with Needles?
-If Shutting Down Needles Need clarification on the following :
- Would you like me to lay off the needles staff? do i have approval to hire a 3rd party HR consultant to run lead on lay off's? Do i have approval for reasonable severance payments to employees for the sudden termination?
- What are we doing with any cannabis products on the Needles Campus? Would you like me to attempt to sell the remaining cannabis goods on the Premises as fast as possible to bring in funds to cover payroll and other expenses?
- What are we doing with any equipment on the premises? Do we just leave them on premises for the landlord or iip to take? Would you like me to attempt to sell them as fast as possible to bring in funds to cover payroll and other expenses? How would you like me to go about this?
- What are we doing with the distro Vans? Would you like me to attempt to sell them as fast as possible to bring in funds to cover payroll and other expenses?
Solister Sale
- As directed on the June 20th Meeting we have found a buyer who is willing to take over Solister inc for the back tax liabilities and are in final stages of signing an agreement
- As directed on the June 20th Meeting we have sold most Cannabis products at the solister premises and are still working on selling any remaining cannabis products.
- What would you like me to do with the any equipment at solister? Would you like me to attempt to sell them as fast as possible to bring in funds to cover payroll and other expenses?
- What would you like me to do with the Delights Brand? Would you like me to attempt to sell them as fast as possible to bring in funds to cover payroll and other expenses?
- We will be laying off employees working at Soister on July 2nd 2025
T here are some of the questions I would need clarification on from the board tomorrow morning.

50. Mr. Kai later testified in a deposition held on March 11, 2026 that Kaplan was present at the MIH board meeting held in July 2025 and that Mr. Kai brought these questions to Kaplan because Kaplan was chairman of the board and he “had conversations with Todd the whole time about things.” Mr. Kai further testified that he “would talk to Todd on almost a daily basis” during that time period and that Kaplan was “like a mentor” to him. Mr. Kai “would talk to him almost on a daily basis about the day-to-day.”

51. In an October 17, 2025 declaration by Jim Dunn, an MIH board member, Mr. Dunn stated he “attended a handful of virtual [board] meetings at the request of Todd Kaplan or other officers . . . .” In a deposition held on March 12, 2026, Mr. Dunn testified that he attended MIH board meetings after March 2025, including at least one sometime in July 2025.

52. It is undisputed that MIH’s cannabis licenses remained in Kaplan’s name through at least September 2025, and on information and belief, remain in Kaplan’s name to present day.

53. On November 20, 2025, Chris Kai produced text messages to Plaintiff. One of the produced conversations from July 16, 2025 was with his MIH colleague Kye Ostby in which Mr. Kai asked Mr. Ostby to “remove everyone else’s metrc access other than Todd Kaplan.” Metrc is the state of California’s cannabis tracking system.

54. The November 2025 text messages produced by Mr. Kai, and Mr. Kai’s testimony from March 11, 2026, show that, despite Kaplan’s sworn testimony to this Court that he had nothing to do with MIH’s operations after March 2025, in fact, Kaplan was in regular contact with Mr. Kai regarding MIH’s operations after March 2025, including:

a. An April 7, 2025 text from Kaplan to Mr. Kai stating, “Call me asap” and conveying critical information about MIH’s operations, including: “The City is cutting off the power”



b. A May 22, 2025 text from Kaplan to Mr. Kai stating, "I just wanted you to know that I got the package from the guy in Colorado today with the ingredients to make the stray for the testing. Let me know when I will see you and I will get it to you."




c. A June 2, 2025 text from Mr. Kai to Kaplan stating, "Good morning Todd, I'm sorry if this puts you under pressure, but you really need to let me know how I'm supposed to pay the invoice that we have on the table now."




55. Robert Scott Kaplan's text messages produced on March 19, 2026 also show that, despite Todd Kaplan's sworn testimony to this Court that he had nothing to do with MIH's operations from after March 2025, in fact, Todd Kaplan was in regular contact with Robert Scott Kaplan regarding MIH's operations after March 2025:

a. An April 3, 2025 text message from Todd Kaplan asking if Robert Scott Kaplan has heard anything from Fouad (referring to Chris Kai):




b. An April 4, 2025 text message from Robert Scott Kaplan asking Chris Kai to "give TK and I a call so we can talk."




c. An April 8, 2025 text message from Robert Scott Kaplan asking Todd Kaplan "Nothing on Needles yet?" To which Todd Kaplan responds, "Nothing. I really don't know what to think or do?"




d. April 17, 2025 text messages in which Robert Scott Kaplan and Mr. Kai are trying to set up a call and Robert Scott Kaplan states "TK can do it now if you want or is 7:00 Better for you guys?"




e. An April 30, 2025 text exchange in which Mr. Kai requests a call with Robert Scott Kaplan and Todd Kaplan;



f. A May 16, 2025 text message in response to Mr. Kai in which Robert Scott Kaplan states he is “working with TK to eliminate some of that by next month;”




g. A June 17, 2025 (one day after the Meeting of Creditors) text message to Mr. Kai in which Robert Scott Kaplan states “TK said he should be done in about an hour so if 2:00 works for you let’s shoot for a call at 2:00;”




h. A June 25, 2025 text message to Todd Kaplan in which Robert Scott Kaplan states: “Drew called. He was thinking of driving out to Needles to look at it. He wants to have a backup plan if the Shulmans or Ace doesn’t do the deal.”




i. A July 24, 2025 exchange with Mr. Ostby in which Robert Scott Kaplan states he is “still trying to get real good definitive answers” about MIH. When pressed for more information, Robert Scott Kaplan states that “a bunch of different people including the landlord and money people and people who care about the people and operation” are “in meetings dealing with it.” On information and belief, one of these people is Todd Kaplan.




[…]




[…]




j. A July 26, 2025 exchange with Orion Santana, another MIH employee, in which, on information and belief, Robert Scott Kaplan states that he "will see what [he] can figure out" from Todd Kaplan regarding "negotiations."




k. A July 28, 2025 exchange with Mr. Santana in which Robert Scott Kaplan states, on information and belief, that he and Todd Kaplan "are trying to get it rectified as fast as we can it's just a lot of cautious issues because of the lawsuit."




56. MIH's cannabis licenses issued by the City of Needles are still under Todd Kaplan's name, as are licenses for MIH's manufacturing and distribution entities, 2103 D LLC, 3247 AM LLC, and Solister, Inc.

57. On September 5, 2025, Bernard Hatz, the Senior Code Enforcement Officer for the City of Needles, with responsibility for auditing and monitoring cannabis facilities, including the one belonging to MIH, testified at a deposition. He testified that Todd Kaplan's name appearing on MIH's cannabis licenses indicates that he is the owner of MIH.

**<u>Subsequent Evidence of Concealed Value and Missing Assets</u>**

58. After the date of discharge, Plaintiff learned that Todd Kaplan concealed assets and/or their value in his Schedules filed in this Court and during the June 16, 2025 Creditor's Meeting.

59. Those acts of concealment included (i) claiming that MIH was "worth nothing;" (ii) failing to account for the proceeds of the sales of MIH's assets; and (iii) failing to disclose his ties to Dab Daddy and the value of that entity.

60. As discussed above, these actions were done in contravention of Orders issued by the Los Angeles County Superior Court.

61. Evidence of Kaplan's concealment of assets and/or their value, including at the time of the Meeting of Creditors and contrary to his sworn statements, include as follows:

62. On August 29, 2025, Bernard Hatz produced records from a recent inspection the City conducted of MIH's operations. The records reveal that, as recently as August 2025, MIH continued its operations by selling cannabis on at least four separate occasions: it removed 335,113 grams of cannabis on August 11, 2025; 83,213 grams on August 21, 2025; 74,480 grams on August 22, 2025; and 103,552.8 grams on August 25, 2025. Mr. Hatz testified that the value of the product

sold by MIH was $800 to $1,200 per pound, which would have resulted in revenue of between $1,051,800 and $1,577,700.

63. Mr. Hatz also testified that MIH's own monthly sales reports show that in June 2025, MIH brought in $418,662.06 for sales of its product from just one MIH-controlled facility. This is contrary to Kaplan's statements during the Meeting of Creditors that MIH was "worth nothing."

64. Mr. Hatz also testified that there was a "robust cannabis operation" at an MIH-controlled facility as of April 3, 2025, and that there was "significant cultivation and manufacturing activity" at MIH facilities as of July 10, 2025.

65. MIH transferred significant product to a separate entity, Dab Daddy, for which Mr. Hatz testified Kaplan holds the license.

66. Robert Scott Kaplan's March 2026 production included a text he received from Kye Ostby, an MIH colleague, August 8, 2025 stating that "the money is being transferred" and that "someone from LA Green Rush […] will be picking up product," evidence of yet another sale.

67. On March 2, 2026, Plaintiff obtained records from KeyPoint Credit Union showing that large sums of money were flowing in and out of several MIH bank accounts through July 2025, indicating operations at MIH were ongoing and that Kaplan's statement that "there's no money to pay anybody" is false.

68. For example, On April 9, 2025, MIH received a $100,000 wire transfer from an individual. In April 2025, MIH received four deposits ranging from $21,000 to $45,000 from one entity in addition to receiving several payments from multiple other entities: $12,618 and $6,455.03 on April 8, 2025, and $6775.04 and $5,815.04 on April 16, 2025. MIH also made several deposits with no known origin: $159,488 on March 17, 2025; $148,238 on March 25, 2025; $10,235.50 on April 4, 2025; $192,000 on April 9, 2025; and $139,308 on April 11, 2025. Throughout May and June 2025, MIH received six deposits ranging from $10,000 to $50,000 from one entity. In June 2025, MIH made three mobile deposits ranging from $24,000 to $33,000. In June and July 2025, MIH received $11,000 and $19,000 payments from another entity.

69. The KeyPoint bank records also show that on June 11, 2025, there was a $35,410 cash withdrawal. The money withdrawn from the bank account has not been accounted for.

70. This does not account for the known cash sales of cannabis during this time period which has also not been accounted for.

71. The money MIH received from cash sales of cannabis has never been accounted for, despite a Court order directing Kaplan and MIH's board to provide an accounting.

72. Kaplan testified at the Meeting of Creditors that the credit cards listed on his Schedules (Dkt. No. 9) discharged in Kaplan's bankruptcy were in fact MIH credit cards.

> **Sterling Marchand:** You've listed a number of credit cards throughout this schedule. Are all of them personally guaranteed by you and not guaranteed in any way by MIH?
>
> **Todd Kaplan:** They're my cards. So, yes.
>
> **Marchand:** Okay, but where you have listed that they were business related: MIH, you were using them for MIH purposes. Is that accurate?
>
> **Kaplan:** Yes.

73. The KeyPoint bank records also show that Kaplan is an authorized signer on all MIH bank accounts, thus maintaining control over the accounts. There is no indication in the records that Kaplan has been removed as an authorized signer.

74. On November 20, 2025, the Los Angeles County Superior Court formally brought contempt charges against Kaplan (and others) as an "individual[] who [has] control over, are acting under, in concert with, or for, and/or are in possession, custody, or control of any documents or assets of MIH."

75. That Court charged Kaplan with contempt for his willful violation of that Court's Orders instructing him as an officer, agent, and/or individual with the ability to direct or control MIH's activities to turn over MIH's assets and an accounting of those assets.

76. The hearing on Todd Kaplan's charges of contempt of court is set for March 3, 2027.

**COUNT I**

**(REVOCATION OF DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(d)(1))**

77. Plaintiff incorporates by reference the foregoing paragraphs and realleges said allegations.

78. Kaplan testified falsely under oath at the meeting of creditors and in his Schedules.

79. Kaplan's discharge in its entirety was obtained through fraud. Kaplan knowingly and fraudulently concealed his continued involvement in ongoing MIH operations, his ongoing interest in MIH, and MIH's ongoing sales and revenues.

80. Kaplan also concealed his control over MIH's bank accounts, which from April to July 2025, had hundreds of thousands of dollars deposited, and withdrawn, and remain unaccounted for in contravention of court Orders.

81. Kaplan also concealed his control over MIH's cash receipts, which from April to August 2025, amount to hundreds of thousands of dollars which remain unaccounted for, in contravention of court Orders.

82. Plaintiff did not have knowledge of Kaplan's fraud described throughout until after the date the Court granted the discharge, August 25, 2025.

83. But for Kaplan's fraudulent testimony and conduct, the Court would have denied Kaplan's discharge.

84. Pursuant to 11 U.S.C. § 727(d)(1), Plaintiff requests that the Court revoke the discharge.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as set forth below:

1. Revocation of the Court's Order of Discharge (Dkt. No. 20) pursuant to 11 U.S.C. § 727(d)(1).

2. For such other and further relief as the Court deems to be justified under the circumstances, including attorney's fees as permitted by law.

DATED: August 24, 2026

BAKER BOTTS L.L.P.

By: [signature]

Sterling A. Marchand (SBN 361586)
sterling.marchand@bakerbotts.com
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, D.C. 20001
Telephone: (202) 639-7700

Cheryl A. Cauley (SBN 252262)
cheryl.cauley@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. 1, Suite 200
Palo Alto, California 94304
Telephone: (650) 739-7500

*Counsel for Plaintiff Francine Shulman*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br>Francine Shulman | **DEFENDANTS**<br>Todd Stuart Kaplan |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Sterling Andrew Marchand (SBN 361586)<br>BAKER BOTTS L.L.P.<br>700 K Street N.W., Washington, D.C. 20001<br>Telephone: (202) 639-7700 | **ATTORNEYS** (If Known)<br>Peter T. Steinberg (SBN 96834)<br>Steinberg, Nutter & Brent, Law Corporation<br>23801 Calabasas Road, Suite 2018, Calabasas, CA 91302<br>Telephone: (818) 876-8535 |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Revocation of debtor's discharge pursuant to 11 U.S.C. § 727(d)(1)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☒ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☒ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

**B1040 (FORM 1040) (12/15)**

| **BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES** | | |
|---|---|---|
| NAME OF DEBTOR Todd Stuart Kaplan | BANKRUPTCY CASE NO. 9:25-bk-10686-RC | |
| DISTRICT IN WHICH CASE IS PENDING Central | DIVISION OFFICE Northern | NAME OF JUDGE Hon. Ronald A. Clifford III |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an “estate” under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor’s discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court’s Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff’s attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.